(No. 80-CC-0867–)

MOHAWK MEDICAL CENTER, INC., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed September 20, 1995.*

SHELDON A. HARRIS, for Claimant.

JIM RYAN, Attorney General (CARA LE FEVOUR SMITH,
Assistant Attorney General, of counsel), for Respondent.

1

OPINION

FREDERICK, J.

The Claimant, Mohawk Medical Center, Inc., filed its claim in the Court of Claims on December 6, 1979. The Claimant seeks One Hundred Three Thousand Nine Hundred Ninety-Seven & 49/100 Dollars ($103,997.49) from the Illinois Department of Public Aid as a participant in the State's Medicaid program for claims that were disallowed by the department. This cause and the claim of Francisco Roque, M.D. (80-CC-0035) were consolidated for trial.

On May 16, 1987, the Respondent filed a consolidated department report. A first amendment to the consolidated department report was filed on May 30, 1990. Pursuant to section 790.140 of the Court of Claims Regulations (74 Ill. Adm. Code 790.140), the departmental report and amendment thereto are considered to be *prima*

*facie* evidence of the facts set forth therein. (*Memorial Medical Center v. State* (1988), 40 Ill. Ct. Cl. 73.) The record indicates copies of the original report and amendment were sent to Claimant's counsel as required. Also, pursuant to our regulations as stated in Court of Claims Regulations (74 Ill. Adm. Code 790.20), it is our practice to follow the Illinois Code of Civil Procedure except as provided in our rules. This is an important distinction as it affects the weight we give to requests to admit and department reports. Our rule on the *prima facie* evidentiary value of department reports is a specific rule in this Court and as such supersedes the Illinois Code of Civil Procedure in regards to requests to admit where there are conflicts. The *prima facie* facts established by the departmental report and the facts established by the testimony, exhibits and Requests to Admit are that Claimant, Mohawk Medical Center, Inc., seeks vendor payments totaling $103,997.49 pursuant to section 11—13 of the Public Aid Code (Ill. Rev. Stat. 1979, ch. 23, par. 11—13, now 305 ILCS 5/11—13) for medical services which it alleges were invoiced to the Illinois Department of Public Aid ("IDPA") during 1978. The identity of such medical services was not indicated in Claimant's complaint. Subsequently, in response to Respondent's discovery requests, Claimant produced copies of IDPA-form drug invoices, representing total gross billings (before reduction to IDPA's maximum-payment ceilings for the drugs and other pharmacy items invoiced) of $101,376.54. Claimant designated the services identified on these invoices as the intended subject of its claim in this proceeding.

Claimant, Mohawk Medical Center, Inc. (hereinafter referred to as "Mohawk"), is an Illinois corporation. Its sole shareholder and "administrator" is Alan Hartzman. Mohawk operated a facility at 832 West Madison Street in Chicago in 1977 and early 1978. The facility consisted

of a number of physicians' offices and a pharmacy, located within a single building.

Mohawk refused to identify the names of certain of its employees who performed their occupational duties within their building. Mr. Hartzman has identified Mr. Everett McCollough as the pharmacist who operated Mohawk's pharmacy. Mohawk's drug invoices (DPA form 215) produced by Mohawk as representing the goods which are the subject of this lawsuit identify the physicians who prescribed said goods (drug and other medical items) as follows: Timothy D. Brandt, Eng June Chang, Sidney Fabian, Calvin Irwin Lewis, Sinisa Momir Princevac, Francisco T. Roque, Ben Irwin Smaller and Zinod Savalal Zazeri. Mr. Hartzman has not supplied any other information to identify the names and professional credentials of these individuals or any other employees of Mohawk.

Dr. Roque had previously testified that, at all times relevant to this claim, he practiced at Mohawk as an employee of Mohawk. In his deposition, Dr. Roque stated that he was not salaried, and was unable to recall what arrangements he had with Mr. Hartzman concerning payment of compensation for his services at Mohawk.

IDPA staff were alerted in 1977 to possible MAP-participation violations by Mohawk and its physicians by the substantial number of drug invoices and physician statements for medical services received from the facility and its physicians which indicated that the IDPA recipients, whom they were treating, were drug addicts or abusers and that questionable medical practices may have been utilized in the treatment of such patients' illnesses.

An on-site review was conducted at Mohawk's facility on January 11, 1978, by an IDPA physician-consultant and a registered nurse, the latter being an employee of the department's Professional Standards Unit. The reviewers

inspected the medical records prepared by Mohawk physicians Roque, Lewis and Smaller, who were then still employed and practicing at the facility. The review team reported the following findings concerning Mohawk and its physicians and pharmacy:

1. Large numbers of patients are seen daily at Mohawk for minimal care.

2. Multiple prescriptions are given to patients during a visit.

3. Patients seen at Mohawk are receiving no specific treatment or service except for continuing or perpetuating a drug habit or dependency.

Based on the on-site reviewers' report, copies of medical records reviewed during the review, and the personal testimony of Dr. Timothy Brandt (former Mohawk physician), the State Medical Advisory Committee recommended at its January 14, 1978, meeting that Drs. Brandt, Chin, Lewis, Roque and Smaller be terminated as MAP-participants and that future invoices from Mohawk be disallowed and payment of them be denied by IDPA.

IDPA staff then attempted to initiate an audit of the business and medical records of Mohawk Pharmacy, the drug-dispensing portion of the Mohawk facility business. On March 21, 1978, an IDPA staff member telephoned Mr. Hartzman, informed him of the department's intention to conduct an audit of the pharmacy's records, and asked that Mr. Hartzman agree to a date for the audit to begin. Mr. Hartzman would not set a date until he had first discussed the matter with his attorney. He stated he would call the IDPA representative back that afternoon but did not do so.

On March 23, 1978, the IDPA representative again phoned Mr. Hartzman who responded that all matters

would have to be handled through his attorney. The representative then called David Blumenfeld, Mr. Hartzman's attorney. Mr. Blumenfeld responded that as the pharmacy had not received an IDPA payment on its drug invoices since mid-December, 1977, the status of the pharmacy would have to be clarified before Mohawk would allow the proposed audit of its records to proceed. Mr. Blumenfeld would not agree to set a date either for an initial interview (the first step in the audit procedure) or for the conduct of an audit of Mohawk's pharmacy records.

The IDPA representative reports having driven past the Mohawk facility on March 29, 1978, and observed that the facility was boarded up and apparently closed. IDPA's Bureau of Program Integrity staff received no communication from Mr. Hartzman or Mr. Blumenfeld concerning the proposed audit following the March 23, 1978, phone conversation.

On April 10, 1978, IDPA served upon Mr. Hartzman, as Mohawk's administrator, and upon Attorney Blumenfeld, Mohawk's registered agent, its notice of intent to terminate and right to hearing as then provided in section 12—4.25 of the Public Aid Code (Ill. Rev. Stat. 1979, ch. 23, par. 12—4.25, added by Public Act 80—2, eff. Dec. 1, 1977). The effect of this notice was to terminate Mohawk's status as a participant in IDPA's MAP. The stated grounds for termination were (a) that Mohawk and its employees had provided care and treatment to addicts without any of them having obtained the required Dangerous Drug Abuse Commission (IDDC) licenses to conduct such activities; and (b) that the pharmacy had refused to allow IDPA to conduct an audit of its records. All claims-processing activities by IDPA, with respect to invoices received from Mohawk, were suspended effective April 10, 1978, in accordance with statute.

On or about July 13, 1978, IDPA issued its final administrative decision which included Hearing Officer Marilyn Kuhr's memorandum of findings following the hearing held on Mohawk's administrative appeal.

On or about August 8, 1978, Mohawk commenced a Cook County Circuit Court action (Docket No. 78-L-15824) entitled Complaint for Declaratory Judgment, Injunction, Writ of Certiorari, Judicial Review of Administrative Proceedings and for Other Relief. The circuit court upheld IDPA's termination decision, ruling that it was not contrary to the manifest weight of the evidence presented. That judgment was affirmed by the First District Appellate Court in *Mohawk Medical Center, Inc. v. Quern*, filed June 4, 1988. 84 Ill. App. 3d 1026.

As a condition of its continuing entitlement to receive "FFP" (Federal financial participation, or Federal matching funds) in the costs of operating IDPA's Medical Assistance Program (MAP), the department is obligated to administer Illinois' program in compliance with Federal statutes and regulations. The Federal-State cooperative endeavor is reflected in a State plan, an agreement between the State and the Federal Department of Health and Human Services (DHHS, formerly DHEW), the terms of which are prescribed by Federal statute. See, e.g., 24 USCA, Sec. 1396a, *et seq.*, and compare section 12—4.5 of the Public Aid Code, Ill. Rev. Stat. 1979, ch. 23, par. 12—4.5.

All states' Medicaid plans are required to:

"* * * provide for agreements with every person or institution providing services under the State plan under which such person or institution agrees (A) to keep such records as are necessary to disclose fully the extent of the services provided to individuals receiving assistance under the State plan, and (B) to furnish the State agency (IDPA) or the Secretary [of HHS] with such information, regarding any payments claimed by such person or institution for providing services under the State plan, as the State agency or the Secretary may from time to time request." 42 USCA, sec. 1396a(27), amended Jan. 2, 1968, by Public Law 90—248.

The same provider (medical vendor) requirement was, in 1977, the subject of Federal regulation, section 450.21 of Title 42, Code of Federal Regulations (CFR), which provided that each State's Medicaid plan must require that:

"Every person or institution [i.e. every medical vendor] providing services under the State plan [must agree] (a) [t]o keep such records as are necessary fully to disclose the extent of the [medical] services provided to individuals receiving assistance under the State plan; and (b) [t]o furnish the State agency [here, IDPA] with such information, regarding any payments claimed by such [vendor] for providing services under the State plan, as the State agency may from time to time request." 34 FR 14649, Sept. 20, 1969; redesignated at 42 FR 52827, Sept. 30, 1977.

By Federal law, this required State-plan provision is one of the many terms and conditions which a vendor agrees to, upon the vendor's request to be enrolled to participate in IDPA's MAP. Mohawk Medical Center, Inc., a retail drug store located at 832 W. Madison St., Chicago, Illinois, submitted to IDPA its MAP enrollment application in December, 1976, bearing the signature of Al Hartzman as owner or corporate officer. In so doing, Mr. Hartzman and Mohawk agreed to comply with all applicable Federal and State laws and regulations, and to comply also with the participation requirements explained in IDPA's *MAP Handbook for Pharmacies*, issued in January, 1977, to all participating pharmacy-vendors.

Page 30 of the *Handbook for Pharmacies*, Topic 148 is entitled "Audits" and explains that "[a]ll services for which charges are made to [IDPA] are subject to audit"; and that one of the purposes of such audits is to enable IDPA to monitor MAP-participating health care facilities and services as required by Federal regulations and State law. Such audits may relate to all of the vendor's services charged (invoiced) for payment by IDPA and may address all such charged services, whether or not previously paid by the department. If an audit reveals that the vendor has submitted incorrect charges, and thus that incorrect

payments were made by IDPA, the vendor must make restitution through recoupment procedures. A necessary implication of this agreed condition of the vendor's participation is the department's right to audit its records also as they relate to suspended IDPA invoices which the vendor has submitted for payment, i.e. those invoices which IDPA has received from the vendor but not yet paid.

IDPA Professional Standards review staff had been allowed some access to certain physicians' medical charts for certain patients during their January 1978, visit to the Mohawk facility. That review-visit had focused upon the nature and quality of "treatment" which such patients were receiving from Mohawk's physicians. The audit, proposed to begin in March, 1978, was intended to review the Mohawk's pharmacy's records, as those records related to the drug invoices, both paid and unpaid, which Mohawk had submitted to IDPA, for goods dispensed during the period beginning with its MAP-enrollment (December 1976) through its MAP-termination in April of 1978. The proposed audit would have addressed the pharmacy's back-up records (script written by Mohawk's physicians, records of drugs and other items actually dispensed independent of Mohawk's DPA-form drug invoice billings), records of Mohawk's wholesale purchases of drugs and related pharmacy items, any available inventory records of drugs and items in stock, etc. Such audit would thus have included a review of Mohawk's back-up support for this claim to determine if such records supported Mohawk's invoices for the 32,798 separate drug and related items allegedly scripted and dispensed during the 43 business days covered by the $101,376.54 in DPA invoices which are the subject of Mohawk's claim.

The pharmacy audit of Mohawk's records pertaining to drugs and related items invoiced to IDPA was never

permitted to take place. Mohawk and Mr. Hartzman have produced no evidence that their pharmacy dispensed 2,044 containers of "drug No. 00746620 Selsun Blue Shampoo Lotion" during this 43-day period as invoiced to IDPA. No documentary support has been offered for the 1,513 bars of 00722300 Lowila Cake 3.75 oz. allegedly dispensed during this same period as invoiced or to support 2,815 containers of 50008052 Alcohol-Rubbins, 70%, 480 cc., 684 items of 60009924 elastic bandage, 940 tubes of 60009916 dermatologic preparations, and 2,520 items (37,971 tablets) of 50000763 Hydroxyzine Tab/Cap 100 mg., unusually large dosages of this sedating drug. These are only some of the items and quantities of items which Mohawk and Hartzman invoiced to IDPA for payment as having allegedly been sold by their pharmacy during the 43 specific days of service during December, 1977, through March 1978.

One of the many factors which IDPA audit staff look for in conducting a pharmacy vendor audit is the extent of correlation between volume and detail of the vendor's wholesale purchases and inventory and the volume and detail of its drug billings to IDPA. Another factor involves a comparison of the vendor's wholesale purchases of drugs having a known potential for abuse, whether alone or in combination with other drugs, against the quantity of sales of such drugs as invoiced to IDPA for payment. Such comparisons are impossible to make when the vendor refuses to allow an audit to occur.

Mr. Hartzman denied IDPA all access to such records while Mohawk was a MAP participant and such refusal was a sufficient ground for Mohawk's removal from the program.

The Illinois Dangerous Drugs Commission (IDDC) was established by the General Assembly, through the

Dangerous Drug Abuse Act, to implement and coordinate the efforts of the private and public sectors in more effectively treating and rehabilitating those Illinois citizens who were suffering the effects of addiction to or abuse of harmful drugs (Ill. Rev. Stat. 1977, ch. 91½, par. 120.1 *et seq.*). Section 14 of the Act prohibited any person from establishing, opening, conducting, operating or maintaining a facility, or otherwise providing any services, "for the treatment, care, rehabilitation * * * of addicts and abusers of dangerous drugs without first obtaining a license from the [IDDC]." Criminal penalties are provided for violations of the Act, including the operation of such a facility, or a physician's practice of medicine "significantly devoted to the treatment, care, rehabilitation * * * of patients suffering from such afflictions." Neither Dr. Roque nor the Mohawk pharmacy had ever obtained the required IDDC license to engage in the activities and supply the goods and services which are the subjects of this claim.

It is apparent that the same license requirement, as a condition to Mohawk's opening of its facility, was just as applicable to its pharmacy operation. A very significant portion of the pharmacy's IDPA-invoiced sales were of drugs in grossly excessive quantities and having well-known abuse potential which the pharmacy was dispensing to known drug abusers.

The appellate court's November 1980 opinion issued to Dr. Roque's appeal (*Roque v. Quern*) (1980), 90 Ill. App. 3d 1015, 414 N.E.2d 161, 46 Ill. Dec. 439), describes the regulatory and licensure scheme found in the comprehensive provisions of the Act for the purposes of controlling abusers' access to abusable drugs and of discouraging profiteering in drug-related transactions to the detriment of such abusers by members of the health care

community and others. Mohawk pharmacy's inventory was the source of the drugs which Dr. Roque and the other seven Mohawk physicians were prescribing for their abuser-patients.

IDPA conducted a complete, computerized analysis of all of the data reported by Mohawk on each of its drug invoices which are the subject of this claim. The analysis indicates that during a period of only 43 business days (December 15, 20 and 22, 1977; January 3 through 17, 19, 21 and 23 through 31, 1978; February 6, 7, 12, 16, 18, 20, 21, 22, 25 and 27, 1978; and March 2, 3, 4 and 6, 1978), Mohawk alleges that it filled a total of 32,798 prescriptions based upon script written by the eight Mohawk physicians previously named herein consisting of drugs and other goods allegedly dispensed to 3,601 different patients over the course of 4,993 different patient-visits as determined by the "date of service" on which a given pharmacy item was allegedly dispensed to a named patient as reported in Mohawk's DPA-form 215 invoices.

The analysis indicates the quantities of Pentazocine (Talwin) and Tripelennamine HCL tablets (PBZ) dispensed by Mohawk as reflected in its IDPA invoices. Mohawk charged for 4,944 separate prescriptions for Talwin, consisting of 74,659 tablets dispensed. During the same period, Mohawk charged for 4,898 separate prescriptions for PBZ (Tripelennamine), consisting of 73,513 tablets. Mohawk provided these drugs over the course of 4,993 patient visits to a total of 3,601 patients. Thus, during the 43 business days covered by the drug invoices here in issue, an average patient-visit resulted in the pharmacy's dispensing 0.99018 Talwin prescription (averaging 15.1009 tablets or capsules per prescription) and 0.98097 Tripelennamine (PBZ) prescription (averaging 15.0088 tablets or capsules per prescription).

Also dispensed during this period were the following antihistamines: Hydroxyzine, 2,520 prescriptions of 100 milligram tablets (total of 37,971 tablets dispensed) as well as 761 prescriptions of 50 mg. tablets (total of 10,711 tablets), and lesser quantity of 25 mg. tablets; Promethazine (Phenergran), 139 prescriptions; as well as the following anti-depressants: Amitriptyline, 1,022 prescriptions of 50 mg. tablets (total of 14,480 tablets dispensed), and lesser quantities of 25 mg. tablets; Doxepin, 545 prescriptions of 10 mg. tablets (total of 3,888 tablets dispensed), and lesser quantity of 5 mg. tablets. Also dispensed were a number of cough preparations with high alcohol content such as: Dimetane expectorant, 445 prescriptions and Benylin expectorant, 17 prescriptions.

The significance of Mohawk's drug-dispensing practices as compared with the needs of its clientele becomes apparent when viewed in the context of addicts' use of the drugs which Mohawk was dispensing.

Talwin (Pentazocine) is a potent narcotic analgesic prescribed for the relief of moderate to severe pain. Since its introduction in the American pharmaceutical market in 1967, Talwin's ability to produce psychic craving, euphoria, tolerance and physical dependence has been well-documented. Since 1976, heroin addicts in the Chicago area have used Talwin in combination with other agents for its euphoric effects. PBZ (Tripelennamine), an antihistamine, is a particularly popular drug for use in such combinations with Talwin to achieve this desired effect.

"T's and B's," "T's and Blues," "Tops and Bottoms," "Toms and Bettys," and "Tricycles and Bicycles" are all slang terms for the Talwin-PBZ combination. "Blues" is derived from the light-blue colored Tripelennamine tablets, and "T's" from Talwin. Users inject varying ratios of Talwin and PBZ tablets until the desired subjective or

euphoric effects are obtained. PBZ reportedly delays the onset and prolongs the duration of the Talwin-induced euphoria. The tablets are dissolved in a small quantity of water and the solution is filtered and then injected intravenously. Addicts experience a rush, reportedly indistinguishable from that of heroin, of 5 to 10 minutes duration, followed by a euphoria which is prolonged for several hours by the drug mixture. Then, the addicts experience restlessness, irritability, abdominal cramps, general malaise and other symptoms as described by Dr. Roque in his testimony. Repeated injections produce repeated rushes.

"T's and Blues," in combination, are sold as a set—one tablet of each drug—that costs $10 to $12 on the street. The combination is used primarily as an inexpensive substitute for heroin when the latter is in short supply or of poor quality. Some users report a preference for "T's and Blues" over heroin, owing to a more consistent high achieved with this mixture. According to pharmacologic theory, the intravenous administration of Talwin should worsen, not relieve, the effects of an addict's withdrawal from heroin dependence because Talwin acts as a narcotic antagonist. Nevertheless, the symptoms of withdrawal can sometimes be relieved by using "T's and Blues." Antihistamines, such as those dispensed by Mohawk, are often combined with Talwin. Alcohol is frequently ingested by users in conjunction with "T's and Blues" injections to modify the "speedy" effects. Sedative agents, including anti-depressants, are used by addicts to counter the severe anxiety, depression, panic and inability to relax associated with the down side of narcotic use.

Mohawk's drug-dispensing pattern for these 43 days of invoiced services correlates closely with the "T's and Blues" use of Mohawk's patients. Virtually every patient

received Talwin and either PBZ or another antihistamine. Approximately 50 percent of the patients received an antidepressant and 1 in 10 received a cough syrup of high alcoholic content. Talwin mixed with the antihistamine produced the high, with ethanol ingested to stabilize the stimulatory effects. Antidepressants blunted the after-effects.

Mohawk and its physicians were among the Chicago-area pharmacies who had attracted IDPA's attention, beginning in 1977 and 1978, with MAP invoices reflecting grossly excessive prescriptions of drugs with well-known abuse potential and physicians' invoices showing services consisting of perfunctory examinations followed by the writing of script for such drugs. It was just such practices which the Illinois Dangerous Drug Commission was attempting to control and eventually eliminate.

These prescribing and dispensing practices cannot be said to represent any legitimate form of treatment nor do they serve to provide any medical benefit to Mohawk's patients.

The Illinois Department of Public Aid (IDPA) pays medical vendors for certain medical services rendered to those persons whom IDPA has determined to be eligible for medical assistance under the Medical Assistance Program (MAP) which IDPA administers. When such persons have been determined to have satisfied all such requirements, they are found to be recipients of medical assistance. Payments to medical vendors are conditional upon the satisfaction of IDPA's requirements, including:

a. the vendor has been enrolled as a MAP participant;

b. the services for which the vendor is billing IDPA have been rendered to a person who, at the time of the service, was an eligible recipient;

c. the services for which the vendor is billing IDPA were services for which IDPA has agreed to pay in the program under which the recipient was eligible ("covered services");

d. where prior approval for such a particular service is required and the vendor is billing for such a service, that the prior approval has been validly obtained;

e. the vendor has properly prepared its invoices (bills and rebills) and has timely submitted such invoices to IDPA in compliance with IDPA's requirements.

Each of these requirements is established by Federal and State law and regulations; each of these requirements is also explained in detail in IDPA's MAP handbooks for providers, which handbooks IDPA has distributed to all vendors who participate in the MAP.

Compliance with these requirements is essential to the efficient processing of invoices. IDPA receives and adjudicates an average of 3.2 million medical service claims each month. These invoices represent services to many of the 1.1 million Illinoisans who are IDPA recipients of medical assistance. A vendor's failure to prepare its invoices properly and submit them within the required time periods not only makes it increasingly difficult and expensive for IDPA to process claims accurately, it also may jeopardize the IDPA's ability to receive from the federal government the matching funds available for many of IDPA's proper payments. *Memorial Medical Center v. State* (1988), 40 Ill. Ct. Cl. 73.

At no time during the operation of Claimant's clinic did Claimant apply for, obtain or possess a license to operate a facility for the care, treatment or rehabilitation of

addicts and abusers of dangerous drugs, as required by the provisions of the Dangerous Drug Abuse Act. (Ill. Rev. Stat. 1977, ch. 91½, par. 120.1 *et seq.*) During the period of December, 1976, through March of 1978, none of the physicians employed by Claimant at the Mohawk Medical Center possessed a license to care for, treat or rehabilitate addicts and abusers of dangerous drugs, as required by the Dangerous Drug Abuse Act. During the course of the proceedings in this case, Claimant did produce IDPA form drug invoices showing a total claim of $101,376.54. The Claimant claims it dispensed pharmaceuticals and medical goods to 3,601 IDPA recipients over the course of 4,993 alleged patient-visits.

The Respondent did not serve Claimant with a written notice for an audit by IDPA. In *Mohawk Medical Center, Inc. v. Quern* (1988), 84 Ill. App. 3d 1026, the appellate court affirmed the Illinois Department of Public Aid's termination of Mohawk as a vendor of medical goods and services under the Medical Assistance Program.

In March of 1978, Mohawk ceased its operations. Mohawk's claim for vendor payments was denied by notice letter on October 29, 1979. The notice stated that, "The basis for this decision include the pharmacy's refusal to allow a Department of Public Aid audit and the fact that Mohawk Medical Center, Inc. was closed by the Department of Public Health for operating without a license."

The memorandum decision of the hearing officer is crucial to the determination of this claim and is therefore set out here in its entirety with Mohawk substituted for Respondent so that confusion can be avoided.

"Mohawk Medical Center, Inc. Pharmacy received a notice dated April 10, 1978, from the Illinois Department of Public Aid stating an intention to terminate its participation as a vendor in the Medical Assistance Program, Ill. Rev. Stat., 1977 and Supp. 1978, Ch. 23, Sec. 5—1, *et seq.* A hearing to be

conducted under the 'Rules for Medical Vendor Administrative Proceedings' (effective December 27, 1977 and amended May 26, 1978) promulgated by the Department under Ill. Rev. Stat. 1977 and Supp. 1978, Ch. 23, Sec. 12—4.25, 12—4.26, 12—4.27 and 12—13, was scheduled for May 8, 1978. Both Mr. Alan Hartzman and Mr. David Blumenfeld as registered agent received copies of this notice.

There were two stated grounds for termination. One was that an 'owner and/or corporate officer' of the pharmacy, Mr. Alan Hartzman, was an administrator of a medical center at the same location which treated narcotic addicts without a Dangerous Drug Abuse Commission license alleged to be necessary under Ill. Rev. Stat., 1977, Ch. 91½, Sec. 120.14. If the Department's allegations were true, either the medical center or Mr. Hartzman would be in violation of state law. If Mr. Hartzman himself were required to have a license, which he failed to obtain, and if he were proven to be an officer or 5%-or-greater owner of the Respondent pharmacy, then the Respondent pharmacy could be terminated under Department rule 4.51(i)(1) because 'an officer or person owning (directly or indirectly) 5% or more of the share of stock or other evidences of ownership in a corporate vendor * * * has engaged in practices prohibited by applicable Federal or State law or regulation * * *.' If the medical center itself were shown to be a vendor as defined in Section 4.22 of Department rules and was required to have a license which it did not obtain, and Mr. Hartzman were shown to be its administrator while having the same incidences of ownership in the Respondent pharmacy as discussed above, then the Mohawk pharmacy could be terminated under Section 4.51(i)(2) because 'an officer or person owning (directly or indirectly) 5% or more of the shares of stock or other evidences of ownership in a corporate vendor * * * was a person with management responsibility for a vendor at the time that such vendor engaged in practices prohibited by applicable federal or State law or regulation * * *.' The second ground for termination in the Department's notice is that the Respondent pharmacy refused to allow a Department audit of the pharmacy, and is thus in violation of Department rule 4.51(d) because it 'failed to furnish any information requested by the Department regarding payments for providing goods or services, or has failed to furnish all information required by the Department in connection with the rendering of services or supplies to recipients of public assistance by the vendor, his agent, employer or employee.' The above two grounds for termination fall within the purview of Ill. Rev. Stat., 1977 and Supp. 1978, Ch. 23, Sec. 12—4.25(A)(d) and (h).

The May 8, 1978, session scheduled by the above notice was postponed because Mohawk's counsel arrived more than an hour late, unaccompanied by Mr. Alan Hartzman, whom Department counsel had asked to call as an adverse party witness. He was unable to proceed, stating that he was in the middle of a jury trial and had 'called a recess' specifically to appear here. It was clear he could not present Mohawk's case but wanted the Department to present its case. Department counsel had one witness available, had subpoenaed another witness who had not appeared, and had expected to call Mr. Hartzman as his first witness. Mohawk's counsel was adamant that Mr. Hartzman be called only after the Department had presented the remainder

of its case, a question the hearing officer said would be decided at a subsequent session at which both parties were to have all witnesses available and to be ready to proceed and conclude the matter. That session could not be scheduled for more than a month because of Mohawk's counsel's trial calendar, since he stated that his current jury trial would run four weeks.

At the June 12, 1978, session, Mohawk failed to appear. Department counsel was asked to call Mohawk's counsel's office approximately one-half hour after the scheduled starting time and represented for the record that his office staff said they had not heard from him all morning. After another brief wait, Department counsel presented his case, with the exception of questioning Mr. Hartzman who had not appeared. He asked that Mohawk be terminated both on the basis of his evidence under Department rule 4.51(d) and (i) and under rule 9.60, which reads in pertinent part: 'If the vender without good cause, fails to appear at a hearing or formal conference scheduled by the Department, the Department's action or decision and the grounds asserted as the basis therefor shall be a final and binding administrative determination.'

Several hours after the conclusion of this session, both Mohawk's counsel and his secretary called this hearing officer to ask for another session, without giving any reason for the request. Mohawk's counsel then submitted a motion which stated that Department counsel had previously been informed by both himself and his secretary of the need for a continuance and had promised to schedule another date. The stated reason for the continuance was that Mohawk's counsel had been unable to go ahead 'on this date (June 12, 1978) as said Robert E. Gorgon was starting a trial in Waukegan in the matter of *Larson v. Libertyville*, 75-L-462,' although this trial ultimately did not go ahead as scheduled. Mohawk asks for a transcript of the Department's case and the opportunity to present a defense to that case. Department counsel denies ever being approached about a continuance prior to the June 12, 1978, session.

Since either the Chief or designated hearing officer decides whether or not to grant continuances, Department scheduling letters explicitly direct parties to call hearing officers if a continuance is necessary. Since this hearing officer was never contacted, it does not appear that Mohawk ever requested a continuance. Department counsel would have little reason to ignore such a request since Mr. Hartzman was to be his first witness. The 'scheduling' problems raised at both sessions appear to be directed toward avoiding making Mr. Hartzman available as a witness until the Department had presented all other evidence. If Mohawk's counsel's Waukegan trial did not go ahead as scheduled, there was no reason for him not to attend the June 12, 1978, session. Further, it does not appear that a trial was even scheduled as claimed. The attached certified copies of orders entered by the Lake County Circuit Court in *Larson v. Libertyville*, 75-L-462, on the nearest dates (June 7 and 16, 1978) show that the case had just been transferred to a new judge and new parties were being brought into the action.

Therefore, the hearing officer finds that Mohawk failed to appear 'without good cause' and under Department rule 9.60 has no discretion to consider either the Department's presentation or any other evidence since the

grounds stated in the Department's notice of termination by rule 'shall be a final and binding administrative decision.'"

The Circuit Court of Cook County affirmed the department's decision as not being contrary to the manifest weight of the evidence. The First District Appellate Court affirmed the judgment. (84 Ill. App. 3d 1026.) Pursuant to Department Rule 4.51(d) and (i) and under Rule 9.60, the two grounds asserted for the basis of the termination became final and binding administrative determinations.

Claimant seeks to relitigate these final determinations in this Court. We decline to do so. We find that Mr. Alan Hartzman, an owner and/or corporate officer of the pharmacy, was the administrator of a medical center at the same location which treated narcotic addicts without a Dangerous Drug Abuse Commission license necessary under the Dangerous Drug Abuse Act. (Ill. Rev. Stat. 1977, Ch. 91½, par. 120.14.) This is a violation of State law. We further find that the Claimant pharmacy refused to allow a department audit of the pharmacy and is therefore in violation of Department Rule 4.51(d). The above two grounds for termination fall within the purview of Ill. Rev. Stat., 1977 and Supp. 1978, Ch. 23, section 12—4.25(A)(d), (H) of the Public Aid Code. Ill. Rev. Stat. 1977, ch. 23, par. 12—4.25(A)(d), (h).

The Claimant should have contested these issues at the administrative hearing. If the Claimant had submitted to an audit or prevailed at the termination hearing, they may very well have prevailed and obtained compensation. We will never know because Claimant refused to submit to an audit and failed to attend the termination hearing. To prevail in this Court, a claimant must exhaust all other remedies and sources of recovery, whether administrative or judicial. Clearly this Claimant failed to exhaust his

remedies. (*Watkins v. State* (1992), 45 Ill. Ct. Cl. 203; *Lyons v. State* (1981), 34 Ill. Ct. Cl. 268; *Fowler v. State* (1982), 44 Ill. Ct. Cl. 431; *University of Chicago Professional Services Offices v. State* (1990), 42 Ill. Ct. Cl. 277.) In *University of Chicago Professional Services Offices v. State, supra,* at 281, this Court held that full compliance with the Department of Public Aid rules and handbook is a prerequisite for exhaustion of remedies. Claimant has clearly failed to exhaust its remedies and for that reason alone this claim is subject to dismissal.

Claimant argues it is not collaterally estopped to raise the issue of proper audit procedure. Claimant states the only findings in the July 14, 1978, memorandum recite Mohawk's failure to appear without good cause thereby making the notice of termination finding. Claimant fails to consider that the grounds stated in the notice became a final decision by Claimant's failure to appear at the hearing. The time to have litigated the audit issue was at the administrative hearing. This Court's exhaustion of remedies law is clear that you cannot bypass a remedy and then try to relitigate the issue in the Court of Claims. Claimant failed to litigate the audit issue in the administrative proceedings where it could have been raised.

Beyond the exhaustion of remedies basis, the Claimant is collaterally estopped from raising the issue in the Court of Claims. Collateral estoppel applies upon proof that the issue decided in the prior adjudication is identical with the one presented in the current suit, the prior suit was terminated with a final judgment on the merits, and the party against whom the estoppel is asserted was a party or in privity with a party in the prior suit. (*In Re Nau* (1992), 153 Ill. 2d 406.) Mohawk was a party to the administrative proceeding involving termination in the MAP program. The issue of the audit was decided at the

administrative decision by virtue of the fact that Claimant's failure to appear made the grounds stated in the notice of termination a final administrative decision. The administrative action ended in a final judgment of termination which was affirmed by the Circuit Court of Cook County and the First District Appellate Court.

We, therefore, find Claimant failed to allow an audit and Claimant was not properly licensed. There is no question that Claimant was properly terminated and that Claimant should have been terminated as a vendor under the State program. Claimant argues, however, that even if Mohawk was rightfully terminated, they would be entitled to payment for pharmaceuticals sold prior to termination. The argument by Claimant fails to take into account the provision of section 12—15 of the Public Aid Code, which had an effective date of December 1, 1977, and section 12—15.1, which also had an effective date of December 1, 1977. Section 12—15 states:

"§12—15. Vendor Fraud and Abuse—Civil Recoveries. Any person, firm, corporation, association, agency, institution or other legal entity (other than an individual recipient) that willfully, by means of a false statement or representation, or by concealment of any material fact, or by other fraudulent scheme or device on behalf of himself or others, obtains or attempts to obtain benefits or payments under this Code to which he or it is not entitled, shall be liable for repayment of any excess benefits or payments received, and, in addition to pay any other penalties provided by law, civil penalties of (1) interest on the amount of the excess benefits or payments at the maximum legal rate in effect on the date the payment was made to said person, firm, corporation, association, agency, institution or other legal entity for the period from the date upon which payment was made to the date upon which repayment is made to the State, (2) an amount not to exceed 3 times the sum of $2,000 for each excessive claim for benefits or payments.

Any person, firm, corporation, association, agency, institution or other legal entity (other than an individual recipient) who, without intent to violate this Code, obtains benefits or payments under this code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled shall be liable for any excess benefits or payments received.

Civil recoveries provided for in this Section may be recoverable pursuant to court proceedings initiated by the Attorney General." Added by P.A. 80—2, 2nd Sp. Sess., Sec. 2, eff. December 1, 1977.

Section 12—15.1 of the Public Aid Code states:

"§12—15.1. Vendor Fraud and Kickbacks—Penalty. Any person, firm, corporation, association, agency, institution, or other legal entity that willfully, by means of a false statement or representation, or by concealment of any material fact, or by other fraudulent scheme or device on behalf of himself or others, obtains or attempts to obtain benefits or payments under the Public Aid Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled; or who solicits, offers or receives any kickbacks or bribes in connection with the furnishing of medical assistance; or who solicits, offers or receives any rebate of any fee or charge for referring any individual to another person for the furnishing of medical assistance under the Public Aid Code shall be guilty of a Class 2 felony." Added by P.A. 80—2, 2nd Sp. Sess., Sec. 2, eff. Dec. 1, 1977.

If the State can recover overpayments, they can surely defend non-payments for claims not properly substantiated.

We find that the Claimant willfully concealed material facts by refusing to submit to an audit for those invoices for which it seeks payment in this Court. We also find that by concealment of material facts, Claimant is trying to obtain payments under the Public Aid Code to which it is not entitled for the reasons heretofore stated. To assist Claimant in its attempt to achieve its ill-gotten gains would verge on being criminal. The required provider agreement required by title 43 Public Health Chapter IV-Health Care Financing Administration, section 431.107(b)(2) required the provider to furnish the agency with any information they may request regarding payments claimed by the provider furnishing services. This Claimant failed and refused to do so.

Based on the evidence of the medications provided, the lack of proper licensure, and the care provided at Mohawk, it is no wonder Claimant did not want to be audited.

We also find that because of the number of addicts treated at Mohawk that the Claimant was in violation of its requirement to have a license under the Illinois Dangerous Drug Abuse Act. On that basis alone, this claim

should be denied. Neither Dr. Roque nor any of the other physicians working at Mohawk Medical Center were licensed under the Illinois Dangerous Drug Abuse Act nor was the center itself so licensed.

Finally, section 14 of the Court of Claims Act (705 ILCS 505/14) states whenever any fraud against the State of Illinois is practiced or attempted by any Claimant in the proof, statement, establishment or allowance of any claim or any part of any claim, the claim or part thereof shall be forever barred from prosecution in the Court. Claimant, since the initial submission of the bills at issue, has attempted to avoid an audit of those bills, has practiced without the proper licenses, and attempted to obtain payment by willfully failing to provide the information requested at the entrance visit. As the Claimant was not properly licensed, we find by clear and convincing evidence that a payment for services to an improperly licensed provider would constitute fraud. Section 111(12) of the provider participation requirements requires a provider to furnish to the Department on the form and manner requested, pertinent information regarding services for which charges are made. Section 111(15) requires the provider to comply with the requirements of applicable Federal and State law and the participant shall not engage in practices prohibited by applicable Federal and State law. It would be a fraud on this Court to pay Claimant while Claimant willfully violates the requirements of participation in the program that Claimant agreed to do.

For the foregoing reasons, it is the order of this Court that the claim of Claimant be and hereby is denied.